ISAAC C. FROST v. CHARLES FROST, impleaded with WIL-
LIAM FROST and TAMER FROST, Widow, &c.

A bill gave C. F. two-thirds of a farm and left to executors the remaining
one-third on a trust, subject to a widow's life estate; and directed C. F.
and the executors to pay S. F. a legacy of $800 (and two small legacies)
in proportion to the shares of land devised. Also, that if C. F. neglected
to pay his proportion, the executors were to sell sufficient to pay. And
there was a provision for partition on the mutual consent of widow, exe-
cutors and devisees. The partition took place; and C. F., at the instance
of the acting executor, gave his bond and mortgage (to such executor) on
the two-thirds of land set apart to him, to secure as well the widow her
share of the life estate as the proportion of legacies payable by him to the
next of kin of S. F. (the legatee, who had died). After this, the widow
died; and, then, C. F. paid the executor his proportion of the legacies and
the mortgage was cancelled. At this time there was no legal representa-
tive of S. F.; and his only child and next of kin was a minor. The exe-
cutor became insolvent and the legacy was lost. *Held,* that it was com-
petent for the executor to take the bond and mortgage; and that the pay-
ment to him under them was sufficient payment by C. F., of his propor-
tion of the legacies.

*Also held,* as the present action, by S. F.'s next of kin, for such proportion
of the legacy of $800, was not commenced by the legatee's next of kin until
six years after the death of the widow of the testator or of the grant of any
administration to S. F.'s widow or of the coming of age of such next of
kin, that the statute of limitations applied.

THIS was a suit brought by the plaintiff, Isaac C. Frost, <span style="float:right">June,</span>
as sole next of kin of Stephen Frost, deceased, to recover <span style="float:right">1850.</span>
in that capacity and in right of his father his proportional
part of a legacy left to the latter in his lifetime by the will
of his grand-father.

The widow and administratrix of Stephen Frost had re-
fused to be a plaintiff and was made a defendant.

Facts appear in the opinion of the court.

The cause was tried at a special term of the supreme
court in Queens County.

Charles Frost only had appeared and set up a defence.

Will.
Legacy.
Executor.
Bond and
mortgage.
Payment.
Statute of
limita-
tions.

The main question was as to payment and the point of the statute of limitations.

Mr. *Burrill* and Mr. *H. G. Onderdonk*, for the plaintiff.

Mr. *W. J. Cogswell*, for the defendant Charles Frost.

*Per Cur.* McCoun, Justice.—Two grounds of defence are taken by the defendant Charles Frost. First, payment ; and, secondly, the statute of limitations.

The payment proved was made by this defendant to Edmund Frost, the executor, by means of a bond and mortgage executed by the former to the latter on the thirtieth day of April one thousand eight hundred and thirty ; and which was paid on the seventh day of January one thousand eight hundred and thirty-eight. If the will authorized the payment to be made through the executor or constituted him the recipient as between the defendant and the legatee or his representative, then, the payment which has been made is a good one and the defendant is not liable to pay the money a second time. The will devises to the defendant two-thirds of a farm ; and left to the executors the other third in trust for the use of William Frost, another son of the testator. These devises were made subject to an estate for life or during the widowhood of the widow. The will then directs Charles (the defendant) and the executors, on behalf of William, to pay to Stephen the legacy in question of eight hundred dollars and two legacies of one hundred dollars each to other persons. These several legacies were payable in proportion to the land devised *i. e.* two-thirds by Charles and one-third by the executors in behalf of William. Then follows this provision : that if Charles shall neglect or refuse to pay his proportion of the legacies, the executors are to sell as much of the land as will pay it. Here is, also, this further provision in the will that, notwithstanding the use of all the estate is given to the wife for life or during her widowhood, if she with the executors should agree to have a division of the estate made before her death, then, the executors are authorized

to act in making such division; and they were to take especial care that she was provided with necessary accommodation and maintenance. Edmund Frost was the only executor out of three who qualified and acted. It appears that on the fourth day of April one thousand eight hundred and thirty, the widow having agreed to give up her life estate in the farm for an equivalent proposed to be secured to her, an arrangement was made between the executor, acting for the widow and, also, for William and the defendant Charles, by which a partition of the farm was effected; and one-third was set off for William's use and the other two-thirds as directed by the will were set off as belonging to Charles. And that this being done, Charles, then, at the instance of the executor and on the twentieth day of April one thousand eight hundred and thirty, made and executed his bond, to and in the name of the executor, in the sum of two thousand five hundred dollars and, also, a mortgage on the portion of the farm which had been set off to him to secure the payment of the bond according to its condition : which was, to pay to the executor a yearly interest on the two thousand five hundred dollars of not less than two *per cent.* nor more than four *per cent.* to be determined by the executor until the obligor should pay his two-thirds of the legacies, viz.: the sum of six hundred and sixty-six dollars and sixty-six cents and when that amount or any part of it was paid, the interest on such amount was to cease ; but the interest on the remainder of the two thousand five hundred dollars should continue to be paid during the natural life of the widow, to be applied exclusively for her comfortable support and maintenance; and the further condition of the bond was to pay to Edmund Frost, the executor or to such person or administrator as should be duly authorized by law to receive it for the benefit of the heir of Stephen Frost, deceased, and to the other legatees named, the obligors full proportion of the legacies, &c. according to the true intent of the will. Stephen had died in the year one thousand eight hundred and twenty-seven, which was previous to the giving of the bond. The testator's widow did not die until the month of April one thousand eight hundred and thirty-seven ; and the interest money was paid and applied

to her use while she lived. In the month of January one
thousand eight hundred and thirty-eight the principal sum
of six hundred and sixty-six dollars and sixty-six cents (be-
ing two-thirds of the legacies and all that the defendant was
bound to pay) was paid by him to the executor; and the
bond and mortgage were given up and cancelled. During
all that time there was no legal representative of Stephen
Frost and the plaintiff, his only child, was minor of about
nineteen years of age. Tamer, his widow, did not take
out letters of administration on his estate until afterwards.
She has refused to be a plaintiff in this suit and is, there-
fore, made a defendant.

Now, the question presents itself, whether the executor
had authority by the will to make the arrangement and to
take the bond and mortgage?

So far as the widow's rights and interests were concerned,
*it is clear that* he possessed the authority. On her agree-
ing to relinquish the farm and to allow it to be divided be-
tween her two sons (the remaindermen) it was expressly
made the duty of the executor " to act therein" and to see
that something in the way of an equivalent was secured to
her. Hence, that part of the bond which produces an in-
come for her was such as his duty required him to take.
So, with respect to the legacies. In case of the defendant's
"neglect or refusal" to pay his proportion of them, the ex-
ecutor was expressly authorized and directed to sell so much
of the land as would pay it. It was optional with the de-
fendant, as it is with every devisee, whether he would ac-
cept the devise *cum onere* or reject it. His objection would be
a refusal within the meaning of the will; and the executor
in that case would be left to exercise his power of sale. If
he accept the devise (and his acceptance would be evi-
denced by his entry upon and use of the land as owner)
and should afterwards fail to pay his proportion of the
legacies when they became payable, such failure or omis-
sion would be a neglect on his part, which might, in like
manner, authorize the executor to resort to a sale of the land.

The power or authority conferred on the executor in either
case required a corresponding duty on his part. A duty to
ascertain whether there would be a refusal by the defen-

dant's non-acceptance of the devise or a neglect growing out of his acceptance and a failure afterwards to comply with the terms of the will. On ascertaining, as he did, the defendant's willingness to accept the devise and to enter into an arrangement for the partition and possession of the farm and thereby to assume a liability to pay a proportionate part of the legacies, it was competent for the executor—and I think fairly within the line of his duty—to take from the defendant a bond embracing that as well as the interest for the widow.

The giving of the bond and mortgage was, therefore, only a compliance with what the executor had the power to require, viz. an assurance against both the defendant's neglect and refusal to pay. It is no objection to this mode of arranging for the payment that the money was thereby made payable to the executor. The will made it his duty to see to the payment. Had he been left to the exercise of his power of sale, the money must have come into his hands, unless the legatees, from a well founded apprehension of his insolvency and danger to the fund, had taken measures to prevent it. The giving of the bond has accomplished no more than might have been accomplished without it; and its existence deprived the legatees of no right they had to prevent the money going into the hands of the executor if they had so desired. It is true that, had the defendant paid the money directly to the legatee or his legal representative instead of paying it into the hands of the executor, it would have been a good payment; but, unfortunately, Stephen was dead and there was no legal representative of his estate at the time the money became payable. It is stated that his widow did not take out letters of administration until the second day of May one thousand eight hundred and forty.

There is no evidence of any collusion between the defendant and the executor or any want of the most entire good faith in the whole transaction; and though the money may have been lost by the subsequent insolvency and death of the executor, the loss is rather ascribable to the extraordinary power conferred on him by the will, than to any fault

of the defendant who paid the money honestly and fairly without any sinister or fraudulent purpose.

But, lest I should be mistaken with regard to the effect of the payment made to the executor, I will examine the other ground of defence, viz. the lapse of time. When did the right or cause of action accrue for the recovery of this money? The time from which to date the right of action most favorably to the plaintiff is, the widow's death, which occurred in the month of April one thousand eight hundred and thirty-seven. Then it was that the defendant would have been entitled, at all events, to be let into possession of his part of the farm; and from the time of his taking possession under the will his liability to pay became fixed. This corresponds with the time of payment mentioned in the condition of the bond. We are speaking, however, of the liability irrespective of the bond and mortgage and as if those instruments had never existed.

It was a liability which attached to the person in virtue of the property devised and became binding in law as for a debt contracted. The land, also, stood charged for its payment.

And what was the remedy to be pursued by the creditor or legatee for enforcing payment? I mean the remedy which the courts of justice could furnish and not the exercise of the executor's power of sale. Doubtless, a bill in equity would have been an appropriate remedy; but this is not a subject matter over which a court of equity has or had " peculiar and exclusive jurisdiction;" for I consider that a court of law had concurrent jurisdiction by action at the suit of the legatee or his legal representative to enforce the payment of this money by judgment and execution in the usual form. Here was a devise of specific real estate charged exclusively with the payment of a sum certain. There could be no right, in any event, to look to the personal property or general assets of the estate for payment. No question could arise about marshalling assets or the abatement of legacies. The executor's assent was not necessary; nor was he a proper party to any suit for its recovery. The devisee enters upon the possession and enjoys the property, assuming to be the owner to all intents and

purposes. Now, nothing more is wanted to enable the legatee to recover in an action of *indebitatus assumpsit* against the devisee, except a promise to pay. Courts of law have required evidence of an express promise, but this evidence has not been confined to the speaking of words of promise. The party's acts are admitted as evidence of a promise. In *Beecker* v. *Beecker*, 7 John. R. 99, an action of assumpsit was sustained against a devisee, upon his promise to pay a specific sum bequeathed as a legacy and charged on the land devised, &c. On a motion in arrest of judgment, the court held that after verdict an express promise was to be presumed. But Kent, Ch. J. in deciding that cause, refrained from giving any opinion on the point whether the action could be sustained without evidence of an express promise. In *Van Orden* v. *Van Orden*, 10 John. R. 30, the same court afterwards held, in an action against a devisee for an annuity, that the acceptance and enjoyment of the estate devised and an actual payment of part of the annuity by the devisee were conclusive evidence of and equivalent to an express promise to pay and entitled the annuitant to recover. So in *Kelsey* v. *Deyo*, 3 Cowen, 133, which was a similar case and where there was no direct evidence of a promise to pay, but payment had been made, from time to time, on account of the legacy. Ch. J. Savage held that, from such facts, an express promise to pay might be inferred; and the plaintiff had judgment. *Tole* v. *Hardy*, 6 Cowen, 333, is another case of like import; and, moreover, shows when the jurisdiction of a court of law may be invoked and when, from the manner in which the legacy is charged, so as to affect both real and personal estate, recourse must be had to a court of equity. In the present case, as I have already shown, the legacy is not so charged as to affect any other property, except the specific real estate devised to the defendant; and so far as evidence of a promise to pay it might be required to sustain an action at law within the principle of the cases cited, that evidence would be found in the act of the party in giving a bond and mortgage which embraced the payment of the legacy and which would be deemed by a

court and jury a full and complete assumption of it as a debt.

This, then, being a case of concurrent jurisdiction in a court of law, the statutory limit of six years applies to it: 2 R. S. 301, sec. 49.

The six years began in April one thousand eight hundred and thirty-seven, when the right of action, if any, arose. The right to call for payment at that time and to sue, if necessary, belonged to an administrator. The delay in taking out letters of administration by Tamer Frost, the widow, was no suspension of the right and produced no such disability to sue as the statute recognizes. Nor is it any objection to the operation of the six years limitation that the plaintiff in this case was not in a position or condition to proceed at law for the money. A court of equity only could afford him relief such as he seeks to obtain in this action; but, still, the right existed in favor of the person legally entitled and if not insisted on and enforced within the time allowed by the statute, it became barred and the defendant's liability extinguished as to every body. It is conceded that this action was not brought within six years of the time when the legacy became payable or of the grant of administration to the widow or of the plaintiff's becoming of age. The statute, therefore, is a perfect protection to this defendant.

If the plaintiff, as the sole heir and next of kin of his father the legatee, has suffered pecuniary loss by the neglect or refusal of the administratrix to take proper measures in time to obtain the money in question, either from the defendant Charles Frost or from the executor or by preventing its going into the hands of the latter, he has a claim over against her, provided that, also, is not barred by the lapse of time.

I do hereby render judgment for the defendant Charles Frost, dismissing the complaint as to him, with costs. But, inasmuch as no defence has been made to this action by or on behalf of the defendant William Frost, the plaintiff is entitled to judgment against him for his (the plaintiff's) distributive share (being two-thirds) of the one-third of eight hundred dollars which was to have been paid out of that

portion of the farm devised and set off for the use of William. There may be a reference to the clerk of Queen's County to compute the amount of the plaintiff's distributive share, with interest upon it at six per cent. per annum from the time of the testator's widow's death. And on the filing of the report, judgment to be entered for that amount, with costs as in cases of judgment by default and execution to be issued on the judgment, to be levied on the lands devised to and set apart for William.